# THE STATE v. MISSOURI, KANSAS & TEXAS RAILWAY COMPANY.

## In Banc, December 19, 1914.

1. **CONSTITUTIONAL STATUTE: Railroad: Discrimination in Passenger Fares: National Guard.** The National Guard when traveling on orders from the Governor travel at the expense of the State, and a statute which requires them to be carried at one cent a mile is a discrimination in favor of the State, and not one between "transportation companies and individuals;" and, therefore, said statute is not violative of Sec. 23 of Art. 12 of the Constitution, which declares that "no discrimination in charges or facilities in transportation shall be made between transportation companies and individuals, or in favor of either, by abatement, drawback or otherwise," since such constitutional provision does not apply.

2. ————: ————: ————: ————: **One Cent Fare: Sec. 14 of Art. 12: A Command Is an Implied Inhibition.** A statute (Sec. 8396, R. S. 1909) which requires railroad companies to carry members of the organized militia, traveling on the order of the Governor, at one cent per mile, while they are authorized to charge all private individuals and other

officers of the State two cents per mile, is violative of Sec. 14 of Art. 12 of the Constitution of Missouri, which declares that "the General Assembly shall pass laws to correct the abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads of this State." That provision not only lays upon the Legislature the duty to do an express thing, but it lays upon it an inhibition not to do a diametrically opposite thing. The command being that the Legislature shall enact laws to prevent unjust discrimination, that command forbids the Legislature to enact laws whose effect is to produce a plain discrimination.

Held, by GRAVES, J., concurring, that Sec. 14 of Art. 12 is not the only provision of the Constitution which authorizes the Legislature to fix maximum passenger or freight rates; on the contrary, rate-making is a legislative matter, and the constitutional provision (article III) vesting the legislative power in the General Assembly gave full power to the Legislature to pass laws fixing maximum railroad rates of all kinds.

3. ————: Discrimination in Favor of State. Said constitutional provision applies to a statute which makes an unjust discrimination in favor of the State. Nothing in its alleged sovereignty or in the fact that by its Constitution railroads are declared to be "public highways," will serve to absolve the State from the application to it of its own Constitution and statutes. The constitutional provision forbidding unjust discrimination in passenger and freight rates is binding upon the State, and a statute which attempts to make such discrimination in favor of the State is invalid.

4. ————: ————: Unjust: Arbitrary. The mere fact that a legislative act fixes a difference in passenger rates does not necessarily constitute an unjust discrimination. If the difference in rates be based upon a reasonable and fair difference in conditions which equitably and reasonably justify a different rate, it is not an unjust discrimination. But a legislative act which requires railroads to carry members of the National Guard to attend target practice, or upon other military duty, at the order of the Governor, upon regular trains, without regard to number, at any hour of the day or night, and to give them all the privileges accorded to other passengers, but at one-half the price fixed by law for carrying others, prescribes an arbitrary and unjust discrimination, and is violative of Sec. 14 of Art. 12 of the Constitution.

5. ————: ————: Rates Fixed By General Act Presumed to Be Reasonable. A rate of two cents per mile for carrying all adult passengers, fixed by a statute enacted only a short time before a special act declaring the rate for carrying members

of the National Guard shall be one cent, is prima-facie reasonable, and will be so held when the question of whether the one-cent rate fixed by the later act is an unjust discrimination is up for determination.

6. ———: ———: As Affected By Public Utilities Act: Obiter. Courts do not determine questions which are not live issues and whose determination is not necessary for a proper disposition of the case in hand. Having reached the conclusion that the statute requiring railroad companies to carry members of the National Guard when on military duty at one cent per mile establishes an unjust discrimination and is therefore void, it is not necessary to determine whether under the Public Utilities Act of 1913 the Public Service Commission is given power to fix railroad passenger rates, or if it has been given such power it was an unconstitutional delegation of legislative power.

*Held*, by GRAVES, J., that the question of the power of the Public Service Commission to fix passenger and freight rates which railroads may charge is involved in this case and should be decided now.

## Mandamus.

WRIT DENIED.

*J. W. Jamison* for defendant.

(1) Section 8396, discriminating by one-half in passenger fares in favor of the organized militia of the State, is arbitrary and capricious, and violates the express command of section 14 of article 12, Constitution of the State, which makes it the duty of the General Assembly to enact laws to prevent unjust discrimination in passenger tariffs on the different railroads of the State. For the same reasons, and on the further ground that said statute seeks to deprive defendant of the equal protection of the law, and to take its property without due process of law for the benefit and use of the State of Missouri, the officers and members of the organized militia of the State, and for the benefit of the United States and its National Guard, the law is in conflict with section 30 of article 2 of the Constitution of the State of Missouri, and section 1 of article 14

of the Amendments to the United States Constitution. Said statute is also in conflict with section 23 of article 12, Constitution of Missouri, which expressly prohibits discrimination by railroads in charges or facilities for transportation, between transportation companies and individuals, or in favor of either in that said statute expressly commands and requires such discrimination in favor of the organized militia and against all persons who are non-members of that organization. Ex parte Gardner, 113 Pac. 1054, 33 L. R. A. (N. S.) 956; Railroad v. Smith, 173 U. S. 684; McCully v. Railroad, 212 Mo. 1. (2) Section 8396 is an attempt to exercise the power of eminent domain, rather than the police power, as it takes private property for public use, that is, for the benefit and use of the State of Missouri and the United States and members of the organized militia and National Guard. The distinction between the two powers should be borne in mind. 22 Am. & Eng. Ency. Law (2 Ed.), 916, 938.

*John T. Barker,* Attorney-General, *Lee B. Ewing,* and *William M. Fitch,* Assistant Attorneys-General, for plaintiff.

(1) The one cent rate provided for the State to pay for carrying her militia is proper, and the statute is neither discriminatory in its effect nor unreasonable in its classification. There can be no unjust discrimination in a rate statute where the lower rate applies to the State itself. The State has the right to require the railroad company to give this service, the same as the State has the right to require it to pay taxes, to serve and promptly transport passengers and freight, to protect the people from injury as far as may be possible, as well as to do many other things of such nature. That provision of the Constitution relied upon by defendant to sustain this ground of its demurrer, does not say that the State shall not fix a rate for the

transportation of her own troops. All that is intended by the section of the Constitution relied upon by de-defendant is that the railroad company shall not be permitted to fix different rates of transportation for the same class of freight or passengers. State ex rel. v. Simpson, 118 Minn. 380; Railroad v. United States, 76 Fed. 186; Interstate Commerce Comm. v. Railroad, 145 U. S. 278; Commonwealth v. Railway, 187 Mass. 436; Willcox v. Gas Co., 212 U. S. 19. (2) The third ground of defendant's demurrer charges that Sec. 8396, R. S. 1909, is in conflict with section 30, article 2, of Missouri Constitution, and section 1, article 14, of the Amendments of the United States Constitution, (a) for the reason that the classification made by said act is purely arbitrary; (b) and seeks to deprive this defendant of the equal protection of the law, (c) and to take its property without due process of law. The classification is not arbitrary, and we do not know in which Constitution or what part of either Constitution there is a prohibition against the State in making such classification; in fact, there is no classification as far as the State's right to fix maximum charges is concerned. There is only a reservation by the sovereign power of the State in dealing with the corporation to require the corporation to transport the State's troops or militia at a certain rate, when the defendant was licensed to do business in the State of Missouri, by accepting its license, it has agreed with the State of Missouri to perform this identical act. Julian v. Star Pub. Co., 209 Mo. 67; Harvester Co. v. Missouri, 34 U. S. Sup. Ct. 859; State ex rel. v. Simmons, 118 Minn. 383; State v. Railroad, 242 Mo. 339; Roeder v. Robertson, 202 Mo. 522; Chilton v. Railroad, 114 Mo. 18; Younger v. Judah, 111 Mo. 303; Railroad v. State, 216 U. S. 262. (3) The fourth ground of defendant's demurrer is based upon sections 12 and 23, article 12, of the Constitution of Missouri. These only apply to railway companies and prohibit them from making certain

charges to the people generally, and do not prohibit the State in the exercise of the sovereign power from requiring a service to be rendered to the State at a less figure than is rendered to the public generally. Willcox v. Gas Co., 212 U. S. 19; Interstate Commerce Com. v. Railroad, 145 U. S. 278; Railroad v. U. S., 76 Fed. 189.

FARIS, J.—Mandamus, brought originally in this court. Plaintiff, upon filing a petition containing apt allegations, procured the issuance by us of an alternative writ of mandamus, the pertinent part of which reiterated the allegations of the petition, and, omitting caption and formal parts, is as follows:

"Comes now the State of Missouri and represents and shows to the court that the Missouri, Kansas & Texas Railway Company is a corporation duly organized and existing according to law and owning and operating a line of railway from Jefferson City to Nevada, Missouri, wholly within this State.

"Your petitioner further shows that this State has formed and maintains an organized militia known and designated as the National Guard of Missouri; and that, under and by virtue of section 8396 of Revised Statutes of 1909 of said State, it was and is the duty of all companies and corporations owning or operating lines of railroad in this State to transport said organized militia or National Guard over the lines of said railroads between points wholly within this State, at the rate of one cent per mile for each man belonging to said organization whenever said National Guard is ordered by the Governor of this State to travel on military duty in this State.

"Your petitioner further shows that on the 22nd day of May, 1914, a part of said National Guard, to-wit, Capt. W. S. Moore and fifteen men of Company L. Second Regiment infantry, was ordered by the Governor of this State to go from Jefferson City to Ne-

vada, in this State, on military duty, to-wit, for target practice at the Government rifle range near Nevada; that on said date Adjutant-General John B. O'Meara, by order of the Governor, and acting for this petitioner; applied to the said Missouri, Kansas & Texas Railway Company for transportation for the said sixteen members of said Company L, Second Regiment, National Guard, from Jefferson City to Nevada, over the line of said railway company at said rate of one cent per mile for each man so transported; that the distance from Jefferson City to Nevada over defendant's railway is 174 miles, and that said Adjutant-General tendered to said railway company the sum of $27.84 for the transportation aforesaid.

"Your petitioner further states that said Missouri, Kansas & Texas Railway Company refused to accept said sum so tendered and refused to issue transportation to said organized militia, and failed and refused to transport said militia as by law it is required to do; and asserts that it will not in future transport said National Guard at said rate."

Defendants demurred to said alternative writ upon one ground and divers specifications, which demurrer that the said ground and the specifications thereunder may be clearly seen, we likewise set out, omitting caption and formal parts, to-wit:

"1.    Because it does not state facts sufficient to constitute a cause of action.

"2.    Because the one-cent militia fare law, section 8396, Revised Statutes of 1909 of Missouri, is in violation of section 14 of article 12 of the Constitution of Missouri, being an unjust discrimination against other passengers in the State.

"3.    Because said one-cent fare law deprived defendant of the equal protection of the law and takes its property without due process of law, and is in vio-

262Mo33

lation of section 1 of article 14 of the Constitution of this State.

"4. Because said section is in violation of sections 12 and 23 of article 12 of the Constitution of this State, which prohibit discriminations in charges or facilities for transportation between companies and individuals, or in favor of either.

"5. Because said one-cent militia fare law is confiscatory and in violation of section 1 of the Fourteenth Amendment to the Constitution of the United States, and section 30 of article 2 of the Constitution of Missouri.

"6. Because the order to Capt. W. S. Moore and fifteen men to go to Nevada, Missouri, and engage in target practice was not military duty within the meaning of said section 8396, Revised Statutes 1909."

From the pertinent part of the alternative writ as we set it out above, and from the above demurrer thereto, the points up for ruling will be clearly seen.

The statute, the constitutionality of which is the only bone of contention, will be found set out at length in the subjoined opinion, to which reference is likewise made for further facts, should such become necessary.

## OPINION.

It is patent that the demurrer to the alternative writ of mandamus is well taken, if, as defendant contends, section 1 of "An Act to establish the maximum rates to be charged by railroad companies for transporting the organized military forces," etc. (Laws 1909, pp. 368 and 369; now Sec. 8396, R. S. 1909), is unconstitutional. In the last analysis this is the only question in the case. Other matters of minor moment are urged, but none of the latter is of any decisive importance in a final determination of the real question in issue.

Statute and Constitutional Provisions.

In order that we may have the matter under discussion plainly before us, we set out said section 8396 below:

"Sec. 8396. Whenever it shall be necessary for the organized militia of the State, designated the National Guard of Missouri, to travel on any railroad between points wholly within this State on military duty, ordered by the Governor, the rate charged shall not exceed one cent per mile for the transportation of each officer and enlisted man, with not to exceed one hundred pounds of baggage or camp equipage, and the individual, company or corporation owning, operating, controlling or leasing such road or part thereof shall be limited to such compensation therefor, and shall not charge, demand or receive any greater rate or compensation for such service."

Defendant, to escape the force of the above section, says that it violates the provisions of section 23 of article 12 of our Constitution, which reads thus:

"No discrimination in charges or facilities in transportation shall be made between transportation companies and individuals, or in favor of either, by abatement, drawback or otherwise; and no railroad company, or any lessee, manager or employee thereof, shall make any preference in furnishing cars or motive power."

And that it also violates the provisions of section 14 of article 12 of the Constitution of Missouri, which thus provides:

"Railways heretofore constructed, or that may hereafter be constructed in this State, are hereby declared public highways, and railroad companies common carriers. The General Assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, and shall from time to time pass laws establishing reasonable maximum rates of charges for the transportation of

passengers and freight on said railroads, and enforce all such laws by adequate penalties.''

Other specific contentions of unconstitutionality are also urged, as the demurrer shows, which we shall discuss when—and if—we reach them.

I.   It will be noted that section 23, supra, forbids discrimination as between, or in favor of, transportation companies and individuals.   The discrimination

*Discrimination in Favor of State.*

here confronting us is not between ''transportation companies and individuals,'' nor is it in favor of such companies or individuals.   We judicially know that the organized militia of the State when traveling ''on orders from the Governor'' travels at the expense of the State, and that therefore the conditions present a case of discrimination in favor of the State of Missouri.   The suggestion urged on us that the United States in the end recoups the State of Missouri for these outlays, does not affect the argument; so we need not inquire whether this be true or not.   Since if it be so, said section 8396 makes, in the last analysis, a prima-facie case of discrimination in favor of the United States as against any and all persons who, not being members of the organized militia traveling on orders from the Governor, are required to pay fare at the rate of two cents per mile.   Neither the State nor the United States is mentioned in said section 23, supra, so no ban thereby is laid against either, which forbids in their favor a discrimination.   We do not think section 23 of article 12 of the Constitution is in point.

II.   The applicable part of section 14, supra, of the Constitution, which defendant contends renders said section 8396 unconstitutional, is the inhibition contained

Unjust
Discrimination
in Passenger
Rates: Power
of Legislature.

in the words: "The General Assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State." It is contended that, since the Constitution in plain terms requires the Legislature to "pass laws to . . . prevent unjust discrimination . . . in the rates of . . . passenger tariffs on the different railroads," by this language and the unmistakable command of its converse it forbids the Legislature to pass any law, the effect of which is to produce a plain, and an alleged unjust, discrimination. May the Legislature having by the express command of the organic law a duty laid upon it to do a certain thing, not only fail to do that thing, but without any other authority from the Constitution, do the diametrically contrary thing? We do not think so. Such a conclusion in the light of our Constitution would serve as the mother in logic of a pestiferous brood of vicious, absurd and outrageous laws, which like chickens would come home to us to roost and vex us. For if the Legislature may validly pass a statute compelling the railroads to carry members of the organized militia for one cent per mile, and thus save to the State at the expense of the railroads, one cent for each mile traveled, it may, by the same token, pass an act requiring such transportation to be furnished for one mill per mile; likewise it may pass a statute requiring all transportation, both of freight and passengers, moving at the ultimate expense of the State, to be furnished at a merely nominal cost. We bear in mind of course such exceptions, if any, as might arise from the constitutional provision which forbids the giving of "free passes or tickets at a discount" to State officers and others. [Sec. 24, art. 12, Constitution.]

Similar statutes, in the main features thereof, have been before the Supreme Court of both Kansas and

Minnesota. Though Kansas has no such constitutional provision as we have here under discussion, it was yet held in that State, In re Gardner, 84 Kan. 264, that a statute which required railroads to furnish transportation to the officers and men of the Kansas National Guard when traveling to perform military duty under orders from competent authority, was invalid, for that it denied to the railroads the equal protection of the laws guaranteed by the 14th Amendment to the Constitution of the United States. In Minnesota, which likewise has no such section in its Constitution as section 23 of article 12, supra, a one-cent-per-mile-fare statute for the benefit of the organized militia and State naval reserves was held, in the case of State ex rel. Simpson v. Chicago, Milwaukee & St. Paul Ry. Co., 118 Minn. 380, not to violate either the Federal or State constitutions in the respect that it took the property of the railroad without compensation, or without due process of law, or that it deprived it of the equal protection of the laws. That these opposite and contrary rulings are irreconcilable goes without saying, but in the view we hold of this case, in the light of the inhibition directed to our State Legislature by section 14 of article 12 of our Constitution, we are not necessarily called on to reconcile the wide differences existing in the views held by the able jurists who wrote these adverse holdings. While the precise contentions held in judgment in the cases of State ex rel. Simpson v. Chicago, Milwaukee & St. Paul Ry. Co., supra, and In re Gardner, supra, to-wit, that our statute violates those Federal and State constitutional provisions guaranteeing due process of law, and the Federal Constitution's provision guaranteeing the equal protection of the laws, are all raised by defendant in the instant case, we need not discuss them; since we have another constitutional provision equally in point, and not subject to doubt and contrariety of ruling.

The Supreme Court of the United States, passing upon an analogous matter in the case of Lake Shore & Michigan Southern Railway Co. v. Smith, 173 U. S. 684, likewise held that a statute of Michigan requiring railroads to issue thousand-mile tickets and sell them at a price fixed by such statute, took the property of the railroad without due process of law and failed to afford to the railroad the equal protection of the laws, and thus violated the 14th Amendment to the Constitution of the United States. The Constitution of Michigan was not, of course, under review or there held in judgment; since it was not the province of the Supreme Court of the United States to pass upon whether the statute violated the Constitution of Michigan. The latter matter was for the courts of Michigan to determine. The statute of Michigan, so held to violate section 1 of the 14th Amendment, provided in substance that all railroads in Michigan, whether intrastate or interstate, should keep for sale and sell at all principal ticket offices one-thousand-mile tickets at a price not to exceed twenty dollars in the Lower Peninsula and twenty-five dollars in the Upper Peninsula; that such tickets should be non-transferable, valid for two years from the date of the purchase thereof, and whenever required by the purchaser should be issued in the names of such purchaser and his wife and children, designating the names of the purchaser and each member of the family on such tickets.

The Court of Appeals of New York in the case of Beardsley v. Railroad, 162 N. Y. 230, likewise held that a thousand-mile ticket law, similar to that held in judgment in Railway Co. v. Smith, 173 U. S. 684, was invalid because it violated the provisions of section 1 of the 14th Amendment to the Constitution of the United States. The identical point has been similarly ruled in other jurisdictions; in fact, in every jurisdiction to which our attention has been called, and in which the question has arisen. [State ex rel. McCue v.

Great Northern Ry. Co., 17 N. D. 370; Commonwealth v. Atlantic Coast Line Ry. Co., 106 Va. 61.] It may be objected that the opinions of the State courts following the ruling of the Supreme Court of the United States in the case of Lake Shore, etc., Ry. Co. v. Smith, supra, upon a Federal question, prove nothing of moment; that it is but a "piling of Pelion upon Ossa." This is conceded. The State courts are compelled to follow the Federal courts upon Federal questions. But it does show with some degree of certainty that the consensus of opinion is that the Supreme Court of the United States is still adhering to the views expressed in the Lake Shore-Smith case, supra, and that the case of Willcox v. Consolidated Gas Co., 212 U. S. 19, is not in conflict, as certainly in our views it is not in point therewith, though counsel rely with much assurance thereon, as likewise does the Supreme Court of Minnesota in the Simpson case, supra. Briefly, the Willcox case, supra, held that so long as the total income of an established gas company, monopolistic as to its occupancy of the field, furnished an adequate profit upon the capital and plant employed, it did not legally matter that as to some customers, namely, the city and its departments, the profit was not enough to do so.

So if by reason of paucity of provisions in our organic law we had been compelled to resort (as counsel among other points urges us to do) to the inhibitions of the 14th Amendment against the passage of any State law which deprives a person of his property without due process of law, or which denies to such person the equal protection of the laws, we could in the above cases, and that of In re Gardner, supra, find authority well grounded and well-reasoned for our holding. But the makers of our own State Constitution, apparently zealous to prevent discrimination and preserve fairness of treatment, not only placed in our organic law the two sections which we quote above and with which we began this opinion, but also section 12 of article 12,

forbidding discrimination in short as opposed to long hauls; section 24 of article 12, which forbids the giving of passes, or the sale of tickets at a discount to certain stated officers, and section 30 of article 2, which forbids that any person shall be "deprived of life, liberty or property without due process of law." We merely mention these provisions *arguendo* to point the moral that the Constitution-makers labored to prohibit discriminations, rebates, combinations, monopolies and unfair practices which might confer upon some patrons of railroads advantages not attainable by others. We are not saying that they apply to the instant case. On the contrary, we say they do not. We mention them to emphasize the frame of mind of the Constitution-makers.

While Alabama (Sec. 243, Cons. 1901), Kansas (Sec. 10, Art. 17, Cons. 1874), Colorado (Sec. 6, Art. 15, Cons. 1876), Georgia (Par. 1, Sec. 2, Art. 4, Cons. 1877), Illinois (Sec. 15, Art. 11, Cons. 1870), Mississippi (Sec. 186, Cons. 1890), Pennsylvania (Sec. 3, Art. 17, Cons. 1874), South Dakota (Sec. 17, Art. 17, Cons. 1889), Texas (Sec. 2, Art. 10, Cons. 1874), Utah (Sec. 15, Art. 12, Cons. 1895), Washington (Sec. 18, Art. 12, Cons. 1889), and West Virginia (Sec. 9, Art. 11, Cons. 1872), each has provisions in their several constitutions, either making it the duty of their Legislature to pass laws to prevent unjust discriminations in freight and passenger rates upon railroads and common carriers, similar to our own constitutional provision (Sec. 12, Art. 12, Constitution 1875), or, providing that no such discrimination shall be permitted; yet our attention has not been called to, nor have we been able to find, any case in either of these States on the precise point. Nevertheless, we feel neither hesitation nor doubt that section 8396, Revised Statutes 1909, is invalid, though we bear in mind the strict rule we are enjoined to follow in declar-

Unjust Discrimination in Passenger Fares.

ing a law unconstitutional (State v. Baskowitz, 250 Mo. 82; State v. Thompson, 144 Mo. 314); for it contravenes the provisions of section 14 of article 12 of our Constitution; provided we shall conclude that the discrimination compelled by its provisions is an "unjust discrimination." Let us look to this point.

III. We do not understand that the defendant contends against the authority of the Legislature reasonably to regulate its rates of passenger fare. This authority is well-settled; but likewise is it well-settled that the exercise of such right must be accomplished by means which do not result in depriving the railroads of due process of law or of the equal protection of the laws. This is the general rule, based wholly upon a consideration of the Federal questions involved, and without any specific reference, as a rule of decision, to our own constitutional provision (Sec. 14, art. 12, Constitution 1875) now being considered.

In the year 1907 the General Assembly of Missouri passed an act (Laws 1907, pp. 170 and 171) so amending section 1192, Revised Statutes 1899 (now Sec. 3232, R. S. 1909), as to fix the maximum fare permitted to be charged by railroads of defendant's class, for the transportation of adult persons, at two cents per mile, and for children under twelve years of age at one cent per mile. A reference to section 3232, as this section now appears in our statutes, will disclose that it does not upon its face specifically purport to fix or "establish *reasonable* maximum rates of charges for the transportation of passengers," authority for which is conferred by section 1 of article 12, supra, of the Constitution, nor is said section 14, either specifically or by the language adopted, in anywise referred to in this statute. Since, however, the only constitutional power to establish a reasonable maximum rate of charge for such service comes from said section

14 of the Constitution, and since said statute indubitably does, by its terms, fix a maximum rate of charges, it follows that the rate of two cents per mile per person so fixed by said section 3232, is prima-facie a "*reasonable* maximum rate.*"* The fixing of the passenger fares at such sum is presumptively a legislative determination that such sum is "reasonable," that is to say, a reasonable compensation for the service rendered. [State ex rel. v. Public Service Com., 259 Mo. 704; Atlantic & P. R. R. Co. v. United States, 76 Fed. 186; In re Gardner, supra.] Such presumption is only prima-facie, and may, of course, be overthrown by an adequate showing in a proper proceeding of the value of the capital employed, and of expenses and receipts during an adequate period. [Railroad Co. v. Wellman, 143 U. S. 339; Dow v. Beidelman, 125 U. S. 680; Budd v. New York, 143 U. S. 517; Reagan v. Loan & Trust Co., 154 U. S. 362.]

In passing and before coming to a discussion of the main question, we may say that we cannot lend our concurrence to the bold position assumed by the State here: That neither the Constitution nor the statute forbidding discrimination relates to, or is binding upon, the State of Missouri. On the contrary there is, we think, nothing in its alleged sovereignty, or in the fact that by our Constitution railroads are declared to be public highways, which will serve to absolve the State from the application to it of its own Constitution and statutes. Yet we gather that some such view is involved in the position of learned counsel for the State. For our attention is called to the case of Atlantic & P. R. R. Co. v. United States, 76 Fed. 186, wherein the ruling is made that the said railroad may be compelled to transport soldiers traveling at the expense of the United States at a fare fifty per cent less than that charged private persons for similar transportation and service. The latter case is no authority for the view that the State by virtue of its inherent sovereignty

may exact from a common carrier a discriminatory rate, or a rate less than that charged to a private person for a like service. The railroad affected by the ruling in the case of Atlantic & P. R. R. Co. v. United States, supra, was what is called a "Land Grant Railroad," as to which the right to exact a lower rate for service rendered to the United States lies in a solemn legislative contract to this effect. It is, we think, surely too unreasonable for dignified discussion, to consider whether section 14 of article 12 of our Constitution, which declares railroads to be "public highways," nullifies by the use of the word "public" the provisions of section 21 of article 2, which forbids the taking of private property for "public use without just compensation." Some such idea must have been in the minds of the makers of the Constitution as this: That since section 20 of article 2 of the Constitution forbids the taking of private property for private use, the railroads could not exercise the right of eminent domain in the absence of a provision thus fixing, in a sense, their public character. The nature of this character and the sense in which such railroads are public highways, may be deduced by the curious, pursuant to the "method of exclusion" by an examination of the cases construing said "public highway" provision in section 14, supra. [Construction Co. v. Wabash Railroad Co., 206 Mo. 172; Nevada to use v. Eddy, 123 Mo. 546; Farber v. Railroad, 116 Mo. 81; Hyde v. Railroad, 110 Mo. 272.] We need not here pursue it further.

Is the discrimination unjust? If a discrimination be apparent, as it is in the instant case, it does not follow as an inevitable corollary that it is an unjust discrimination. It needs neither a statute nor a constitutional provision to make unjust discrimination unlawful, for such discrimination was forbidden by the common law. [Porcher v. Northeastern Railroad, 14 Rich. (S. C.) 181; Hannibal, etc., Railroad Co. v. Swift, 12 Wall. 262; Great Northern Railroad Co. v. Shep-

herd, 8 Welsb. H. & G. (Exch.) 30; 4 Elliott on Railroads, sec. 1467.] While the question has arisen as a rule in cases brought by a shipper, injured in his business by such alleged discrimination, to recover damages (Sloan v. Pacific Railroad Co., 61 Mo. 24); or in proceedings against railroads for violations of statutory provisions forbidding discriminations (L. & N. Railroad Co. v. Com., 108 Ky. 628), we can yet see no valid reason for not applying the learning in the other cases as a decisive test in determining whether the one-cent-militia-fare statute is unjustly discriminatory as the term is used in our Constitution. For if a railroad be forbidden by law, or by the Constitution, to make unjust discriminations, it follows surely that it cannot by law be compelled to make them.

Arbitrary discriminations alone are unjust; if the difference in rates be based upon a reasonable and fair difference in conditions which equitably and logically justify a different rate, it is not an unjust discrimination. [Interstate Commerce Com. v. Alabama Midland Ry. Co., 168 U. S. 144; Interstate Commerce Com. v. Chicago G. W. Ry. Co., 209 U. S. 108; Bayles v. Kansas Pac. Ry. Co., 13 Colo. 181; Root v. Long Island R. R. Co., 114 N. Y. 300; Lough v. Outerbridge, 143 N. Y. 271; Hoover v. Pennsylvania Ry. Co., 156 Pa. St. 220.] Illustrating this view it was held in the case of Com. v. Interstate Con. Street Ry. Co., 187 Mass. 436, that a law requiring street railways to carry pupils of the public schools at rates not in excess of half the regular fare charged others for like hauls, was constitutional. In the course of its opinion, at page 438, the court said:

"The most important and difficult question in the case is whether there is constitutional justification for a discrimination between pupils of the public schools and other persons. If this were an absolute and arbitrary selection of a class, independently of good reason for making a distinction, the provision would

be unconstitutional and void. As was said by Mr. Justice Brewer in Gulf, Colorado & Santa Fe Railway v. Ellis, 165 U. S. 150, 159: 'Arbitrary selection can never be justified by calling it classification. The equal protection demanded by the Fourteenth Amendment forbids this.' The subject of compelling a railroad company to make an exception as to its rates, in favor of a certain class of persons, was considered elaborately in Lake Shore & Michigan Southern Railway v. Smith, 173 U. S. 684, and it was held that ordinarily the Legislature has not power to compel such action. The subject is also referred to in Wisconsin, Minnesota & Pacific Railroad v. Jacobson, 179 U. S. 287, 301. But if the difference is founded on a reasonable distinction in principle, such discrimination does not deny the equal protection of the laws. [Opinion of the Justices, 166 Mass. 589; Pacific Express Co. v. Seibert, 142 U. S. 339; American Sugar Refining Co. v. Louisiana, 179 U. S. 89, 92.]

"In this case the selection of a class is not entirely arbitrary. The education of children throughout the Commonwealth is a subject for legislation which has occupied the thoughts of our lawmakers from early times. The duty of legislatures and magistrates to be diligent in the promotion of education, among all the people, is especially declared in chapter 5, section 2, of the Constitution of the Commonwealth. Compulsory attendance of children in the schools is provided for by our laws. [R. L. ch. 44, sec. 1.] Money may be appropriated by cities and towns for conveying pupils to and from the public schools. [R. L. ch. 25, sec. 15.] It cannot be said that the Legislature may not concern itself with the transportation of children to the public schools in the interest of popular education, just as it provides such children with books and other necessary articles. [R. L. ch. 42, sec. 35.] So far as this statute merely gives help to these pupils in connection with their acquisition of knowledge in the schools, it is jus-

tified. As a police regulation in the interest of education, the law may well require street railway companies to permit these children to ride to school upon their cars, without profit to the companies, provided it can be done without causing them loss. But if such a requirement involves expense, the cost can only be put upon the general taxpayers. It cannot be imposed upon the street railway companies, or upon that part of the public which pays fares to street railway companies. If, therefore, it plainly appeared that the enforcement of this section would cause expense to street railway corporations, which they must bear themselves, or put upon other classes of passengers in the form of increased fares to make good the loss from carrying school children at half rates, we should be obliged to hold that there was a taking of property without due process of law, through unconstitutional discrimination.''

In the case of In re Gardner, 84 Kan. l. c. 267, the Supreme Court of Kansas holding invalid a statute on all-fours with the instant one, in the course of its opinion, on the phase of discrimination, said:

''This court is not inclined to the view that the power of the Legislature is completely exhausted by a maximum rate regulation, and does not so interpret the decision quoted. But members of the National Guard cannot be segregated from the body of the State's citizens and made a preferred class, unless they sustain some relation to transportation by rail which, in the nature of things, indicates they should have the benefit of an exceptional rate. Classification, to be valid, must be based upon differences in character, condition or situation which lead to that difference in regulation which the statute undertakes to make. Thus, in the case involving a reduced rate for school children on street cars (Commonwealth v. Interstate Con. Street Ry., 187 Mass. 436), the considerations which moved the court to sustain the rate were, among others, that pu-

pils go to and from the public schools at hours when other persons make little use of the cars; that they are of such a size and age that they occupy much smaller spaces than other passengers; and that the difference in rate was of so much importance to parents that twice as many pupils would ride at half rate as at full rate, so that the revenue of the carrier would not be materially reduced. This court neither approves nor disapproves the conclusion reached in that case, but the method employed for testing the classification upon which the rate was based is sound."

Approving a similar view upon the principle under discussion, the Circuit Court of Appeals in the Seventh Circuit, in the case of United States v. Chicago & N. W. Ry. Co., 127 Fed. l. c. 792, quoted with approval the rule laid down by Elliott on Railroads, viz.:

" 'Neither at common law, nor under the Federal statute, does the mere fact that there is a difference in rates necessarily constitute an unjust discrimination, since there is no such discrimination in cases where the conditions and circumstances are essentially different. It is the English rule that, in passing upon the question of undue or unreasonable preferences, various facts and circumstances must be considered, and that an undue preference, within the meaning of the statute, is not shown by mere evidence of a difference in charges. The Federal courts have substantially adopted the rule declared by the English courts.' "

If members of the organized militia averaged in weight but one-half that which other members of the traveling public weigh, or if they traveled at fixed hours or times when other business is slack; or if they carried far less, rather than far more baggage, equipment and *impedimenta,* than the ordinary traveling person carries; or if they traveled at known and definitely fixed times, in large bodies, or by the trainload; or if travel with them were a matter of personal volition, to be exercised or not as a low rate might in-

duce, rather than as a matter of stern duty transacted under order; or if the service of transportation required to be furnished were of an inferior class by a slow, unscheduled train, rather than that furnished to regular passengers who are compelled to pay two cents per mile, there might be some valid reason for saying as a matter of law that the plain discrimination presented is not an unjust discrimination. [Louisville, etc., Ry. Co. v. Wilson, 132 Ind. 517; Messenger v. Pennsylvania R. R. Co., 37 N. J. L. 531.]

Upon this identical phase of the case we are constrained to concur in what was said by the Supreme Court of Kansas in the similar case of In re Gardner, supra, at page 268:

"In accordance with the principle recognized, the Legislature might no doubt require that precedence be given to the transportation of troops over other traffic, that special facilities for the movement of troops be supplied, that special schedules be adopted and that other exceptional services be rendered whenever the public interest demands them. But the law in question has no such basis for the discrimination which it makes. Major Mills stood upon precisely the same footing, so far as the expected service to him was concerned, as any other individual. The times when members of the National Guard will travel are as uncertain as for other people. The number who will travel at any particular time is wholly indefinite. They come to the railroad station singly, in groups or in larger bodies, just as other citizens come singly, in groups or in crowds sufficient to load the cars of one or more trains. They occupy the same space and have the same privileges as other persons. Their movements are controlled by duty and not by special inducements, and the matter of rate can have no effect upon the volume of traffic. They are taken up, carried and set down without any mark or circumstance whatever to distinguish

them from the general public, or to distinguish the
subject of their transportation from that of the general
public, except that they carry orders for transporta-
tion without payment of fare and at reduced rates.
Without any ground, therefore, for the classification,
and without any regard to the reasonableness or un-
reasonableness of the regulation, the State simply de-
mands that its troops be transported by rail at a purely
arbitrary rate, which, so far as the principle involved
is concerned, might be one cent per hundred miles or
nothing at all. No other corporation or individual in
the State is obliged to conduct business upon any such
partial and unequal conditions or to make any such
sacrifice for the support of the National Guard or any
other public institution or purpose. Therefore the act
denies the railroads the equal protection of the laws.''

It fairly follows then that if two cents per mile
per passenger was a reasonable rate in 1907, as the
General Assembly by legislative act by all fair intents
presumptively determined and fixed, then in the ab-
sence of a showing of some change in conditions (and
there is no such here in the instant case) one cent per
mile per adult passenger was not reasonable in 1909,
when the special act favoring the organized militia was
passed, and is not reasonable now. The law prescrib-
ing such a rate was clearly a discrimination and vio-
lative of the provisions of said section 14, which pro-
vides for the passage of laws to prevent discrimina-
tions, and by its plain, cogent converse forbids the
passage of a law compelling the railroads to discrimi-
nate; when, as we have concluded above, this discrim-
ination was unjust, for that it laid an extra burden up-
on the railroads.

We think this view could easily be sustained by
the great weight both of authority and reason on the
ground that it violates the provisions of section 1 of
the 14th Amendment to the Constitution of the United
States, as was done by the Supreme Court of Kansas

in the case of In re Gardner, supra, and in the analogous cases of Lake Shore & M. S. Railroad v. Smith, supra, and the four or five cases which followed the latter case; but fortunately we are saved from the embarrassment of deciding between the above cases and that of State ex rel. Simpson v. Chicago, M. & St. P. Railroad Co., supra, by the provisions of said section 14 of our Constitution and so we may clearly hold it invalid for that it is in conflict with both the spirit and the letter of section 14, supra, of our Constitution.

IV.   Having reached this conclusion we need not take up space to inquire whether said section 8396 is a bona-fide effort to establish rates and regulate railroad transportation, or whether it is purely a revenue measure, ingeniously designed to shift from the taxpayers and from the State revenue fund, to the railroads of the State, a portion of the cost of maintaining the organized militia.   [In re Gardner, 84 Kan. l. c. 269.]   The curious may read in the Kansas case, supra, an interesting discussion of this phase of the statute under criticism, and may learn therefrom under what conditions such special and unequal burdens may be imposed.

Other matters mooted, have by the conclusion reached become merely academic; for example, the contention that Captain Moore and his men were not engaged in such military duty as to bring them within the purview of the statute.   If a statement of this contention, in the light of the fact that the Governer is the Constitution-appointed commander-in-chief of the National Guard, and upon a consideration of all the statutes providing for the government of the National Guard, does not plainly answer it, we will nevertheless leave it till it becomes a live question in a live case.

Furthermore, it is strenuously urged by learned counsel for plaintiff through many pages of an able

brief, that we erred most seriously in holding in effect that the power in a proper case to raise railroad rates, above the maximum fixed in section 3232, Revised Statutes 1909, is under our Constitution delegable by the Legislature, and that by the enaction of section 47 of the Public Service Commission Act (Laws 1913, p. 583), section 3232, supra, is conditionally repealed or temporarily suspended. [State ex rel. v. Public Service Com., 259 Mo. 704.] In this holding, it is contended, we overlooked the plain letter of the Constitution and in that case held (to quote the epigrammatic language of counsel) what we "thought the law ought to be rather than what it is." We do not think this question is in, or that it could ever get into, this case, having conceded, as we do, the prima-facie reasonableness of the two-cent rate, till its unreasonableness be demonstrated. Be this as may be, however, having come to a conclusion by another path, we will leave this question where State ex rel. v. Public Service Commission left it, till it again becomes the "lion in the path."

It follows therefore that the demurrer of defendant to the alternative writ of mandamus should be sustained, and since said writ was improvidently granted, it should be quashed, and the issuance of a peremptory writ denied. It is so ordered. *Lamm, C. J., Brown* and *Walker, JJ.,* concur; *Woodson, J.,* concurs and also for reasons given in case of In re Gardner, 84 Kan. 264; *Graves, J.,* concurs in separate opinion; *Bond, J.,* dissents.


GRAVES, J. (concurirng).—I concur in the result reached by the majority opinion, and in most of the reasoning therein by our Brother FARIS, the writer thereof.

I agree that section 14 of article 12 of the Constitution directs the Legislature to pass laws to prevent "unjust discrimination" in passenger and freight

rates.  I agree that the converse of this should also be true, i. e., that the Legislature should not itself pass a law which makes "unjust discrimination," and if it passes such a law it should be condemned as violative of the spirit of this constitutional provision.  It should be noted that the terms of this constitutional provision is mandatory, in as much as it uses the word "shall" in a mandatory sense.  However, there is no way of enforcing this mandate of the Constitution, except by the voluntary act of a Constitution-loving Legislature. I agree further that the Legislature in passing section 3232, Revised Statutes 1909, was attempting to carry out that other mandate of said section 14, article 12, of the Constitution which imposed upon the Legislature the duty to "from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers."  I also agree that when it did pass this law it was prima-facie a reasonable *maximum* rate, and that without there being further showing, we have a right to say by comparison that the latter law is unjust and discriminatory, and therefore bad.

I do not agree to that portion of my brother's opinion whereat he says:

"Since, however, *the only constitutional power* to establish a rate or charge for such service *comes from said section 14 of the Constitution.*"

The italics are ours.  This in my judgment is not the only constitutional source of power for the Legislature to pass maximum passenger or freight laws. Rate-making is a legislative power, and has always been so held and considered.  When by article 3 of the Constitution the powers of State government were divided into three distinct departments, i. e., legislative, executive and judicial, and when by section 1 of article 4 the legislative powers were vested in "the General Assembly of the State of Missouri," such General Assembly became fully possessed with the power

to pass rate laws of all kinds, such things being legislative in character rather than judicial or executive in character. So that I say the legislative branch had full constitutional power to pass all kinds of rate laws, had there been no section 14 of article 12 of the Constitution. This may be important in some future litigation where the real purpose of section 14 of article 12 will have to be discussed, and for that reason I do not want to be recorded as announcing that said section 14 is the only constitutional authority for legislative action as to maximum rates in Missouri.

I do not agree to another conclusion which my brother has reached. I think that the constitutionality of section 47 of the Public Service Commission Act is fairly lodged in this case, and that we should thresh it out at this time. It is only a question of a short time when we will be forced to thresh out the question. If the public print is to be believed, then at this very time the railroads of the State are asking the Public Service Commission to raise their rates under said section 47, and with a showing that they are justly entitled to such a raise in rates. The constitutionality of that section has never been adjudicated by this court. We did hold in State ex rel. v. Public Service Commission, 259 Mo. 704, that the Legislature by said section 47 intended to authorize the Public Service Commission to raise rates above the maximum fixed by section 3232, supra, but we did not pass upon the question as to whether or not the statute, thus construed, violated section 14 of article 12 of the Constitution. This question should be passed upon now so that these railroads may know whether they shall go to the Public Service Commission or to the Legislature for their needed redress. The question is squarely lodged in this case, and this is an opportune time for the judgment of the court upon this extremely intricate question as to whether or not the Legislature can, under section 14 of article 12, delegate to any commission the right to fix

*maximum rates.* We purposely underscore the words "maximum rates." This delicate question might be stated otherwise, and perhaps be made plainer. If the Legislature had the constitutional power without section 14 of article 12 to fix rates, both maximum and minimum, then should said section 14 be construed as an express limitation upon the power of the Legislature to delegate such right to a commission or other body? But it is not my purpose to discuss the constitutionality of section 47 supra. It is my purpose to dissent from the majority views in postponing the evil day, when in my judgment the time is ripe for us to act now.

I therefore concur in the result, and in such portions of the opinion as above indicated.