TEXAS MEXICAN RY. CO. v. STATE. (No. 5369.)

(Court of Civil Appeals of Texas. San Antonio. Feb. 17, 1915.)

1. RAILROADS ☞51 — FREIGHT TRANSFER — FACILITIES.

The middle of an international bridge, which was owned half by a railroad company of Texas and the other half by a Mexican company, is not such a place as is meant by the statutes requiring the erection of structures suitable for the protection of freight, and the railroad company cannot be compelled to build an inclosure to transfer freight at that point.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 116–118, 120; Dec. Dig. ☞51.]

2. CARRIERS ☞18, 20—COMMON CARRIERS— DUTY TO EXCHANGE FREIGHT.

Where a Texas railroad company wrongfully refused to exchange business with a foreign company, it is subject to the penalties provided by Rev. St. 1911, art. 6615, and may be required to discharge its duties by mandamus or injunction.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24, 33–49, 133, 927; Dec. Dig. ☞18, 20.]

3. RECEIVERS ☞35—APPOINTMENT—NOTICE.

The National Railways of Mexico having come into the control of a revolutionary faction, the defendant railroad company refused to accept freight and passengers therefrom and exchange its equipment with such company. The defendant railroad company was insolvent, and it lost considerable revenue from its refusal to make exchanges with the Mexican company. Neither creditors nor stockholders of the defendant railway company were complaining of its course, and it was extremely questionable whether those controlling the Mexican company could offer security for the return of equipment. Rev. St. 1911, art. 2128, relating to the appointment of receivers in general, does not require notice of appointment. Held that, though notice was not required, it should be given except in case of emergency, and that there was no emergency warranting the appointment without notice of a receiver

on suit by the state for the forfeiture of the charter of the defendant railroad company.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 54–60; Dec. Dig. ☞35.]

Appeal from District Court, Webb County; J. F. Mullally, Judge.

Suit by the State of Texas against the Texas Mexican Railway Company. From an order appointing a receiver without notice, defendant appeals. Reversed and remanded.

Greer & Hamilton, of Laredo, and Hicks, Hicks & Teagarden and Houston, Boyle & Storey, all of San Antonio, for appellant. B. F. Looney, Atty. Gen., John A. Valls, of Laredo, and Luther Nickels, Asst. Atty. Gen., for the State.

MOURSUND, J. This is a suit filed by the state of Texas, on August 11, 1914, through its Attorney General, joined by the district attorney of the Forty-Ninth district, against the Texas Mexican Railway Company, hereinafter referred to as "railway," seeking a forfeiture of its charter, with prayer for mandamus or mandatory injunction to compel the railway to operate and open its tracks on and to half of the International Bridge at Laredo, Tex., between the United States and Mexico. We adopt appellant's statement of the grounds upon which the forfeiture is sought, as follows:

"First. It is alleged that the railway owns tracks to the middle of the International Bridge at Laredo, Tex., and that part of the bridge up to the middle of the Rio Grande river on the Texas side; that these tracks and bridge are the only means of railway connection with the National Railways, a foreign railway company on the Mexican side, the tracks of which go to the middle of the International Bridge and connect as a continuation with the railway; that the railway refuses to accept freight at Laredo, Tex., to be carried across said bridge, and refuses to interchange cars and traffic destined to cross said bridge into and out of Mexico, although the National Railways have tendered freight and cars to it and are willing to interchange cars and freight; and that therefore it is not performing its duties to the public and is not operating its full line of road as provided by the laws and Constitution of Texas; and that this refusal to so operate and interchange traffic has existed since April 26, 1914.

"Second. It is further claimed that the railway is insolvent, or in imminent danger of insolvency, and for this reason forfeiture is sought and a receiver prayed for under article 1201 et seq. of the Revised Statutes. In this connection it is alleged that the railway owes bonds and liens to the extent of $2,340,000, $960,000, which is past due, and that the railway has been and is unable to meet that part past due, and that, in addition thereto, it owes accumulated interest on bonds to the extent of $1,800,000 which it is now unable to meet, and that it has no prospect of meeting same unless it be compelled to operate said bridge and interchange facilities, its failure so to do causing, and having caused it to lose large sums of revenue. In addition thereto, it is alleged that the railway owes a further amount of $331,969.54, which it is unable to pay at this time, and will be unable to pay especially unless it shall be compelled to operate the bridge facilities and

properties so as to derive revenues therefrom. It is alleged that, to offset its indebtedness, the assets of said railway of physical properties are not worth more than $1,910,541.33, and that debts due it aggregate $196,964.70, a large amount of which latter is not collectible. It is alleged that notwithstanding said insolvency, as alleged, the railway is able to operate its bridge and interchange facilities, and that, if it actually did so, such condition of insolvency would be remedied, and that such insolvent condition has been brought about by failure and refusal to operate its property.

"Third. As a further ground for forfeiture of its charter, it is claimed that the railway has violated section 6, art. 10, of the Constitution, forbidding the consolidation of foreign and domestic railway companies, and, further, that the National Railways, a foreign railway corporation, practically owns and maintains said railway in Texas, contrary to statute. As a basis of this claim, it is alleged that the National Railways, a foreign corporation, owns, controls, and operates the railway, and that there is a consolidation between the two. This is effected, it is averred, by reason of the fact that the National Railways owns $2,495,000 out of $2,500,000 of the capital stock of the railway, and owns and controls all of its bonds, to the amount of $2,340,000. It is alleged that, through the ownership and control of said stock and bonds, the National Railways places in charge of the railway's properties persons selected by the foreign railway, and that the president of the foreign railway is also president of the railway, and has always been the same, and that all the agents and officers of the railway accept positions with it with the understanding that they will operate the railway with an eye alone to the foreign railway's interests, irrespective of the railway's interest and duties, and will continue so to do, and that especially are they so doing with respect to closing said bridge and transfer facilities, and that this closing and refusal to operate has been by the direct orders of said foreign corporation, and it is alleged that such failure to operate the bridge and facilities and properties is the cause of the insolvency or imminent insolvency of the railway. It is alleged that said National Railways, which owns the remainder of the bridge and connecting tracks with the railway, refuses to permit it to open the bridge and interchange freight."

In addition, the petition, for the purpose of showing an emergency justifying the extraordinary relief prayed for, at length clearly and forcefully stated the facts showing the great amount of freight ordinarily transported into and out of Mexico by way of Laredo; the great decrease therein owing to the fact that it has to be hauled across by means of wagons at considerable extra expense; the additional expense of shipping through one of the other three places where international bridges connect this state with Mexico; the injurious effects upon the revenues of the appellant; and the inconvenience and damage inflicted upon the traveling public, other carriers, and the business interests of citizens of this state and other states. It is alleged that the tracks of the International & Great Northern Railway Company and of the Rio Grande & Eagle Pass Railway Company connect with those of appellant railway at points about 600 feet north of the center of the bridge.

Certain affidavits are attached to the petition which show that those in physical control of the National Railways of Mexico, at least so far as they connect with Laredo, held such control and operated the same as appointees of Gen. Carranza, the head of one of the factions in Mexico; that such persons were willing to interchange cars and freight with appellant; but that the president of the National Railways, Mr. Brown, who is also the president of appellant, refused to permit appellant to interchange cars and freight with those who have taken possession of National Railways.

The exhibits attached also disclose: That on July 30, 1914, a conference was held between representatives of the International & Great Northern Railway Company and of the Constitutionalists in charge of the National Railways, at which such Constitutionalist representatives claimed to be in control of a certain amount of mileage and to have sufficient equipment to operate, and that the bridge was absolutely in their hands and the Texas Mexican Railway Company had nothing to do with the interchange of traffic between the International & Great Northern Railway Company and the Constitutionalists' railways. The representatives of the International & Great Northern Railway Company were willing to interchange traffic provided the Constitutionalists' railways arranged with the Texas Mexican Railway Company for the movement of freight across the bridge, and made delivery and received all freight in the yards of the International & Great Northern Railway Company, but owing to unsettled conditions in Mexico were unwilling to have any interchange of equipment, and all freight would have to be transferred at the expense of shipper, and all charges paid before it would be turned over by either of said companies to the other. But, if the Texas Mexican Railway Company should recognize the National Lines of Mexico as being part of their system while in the hands of the Constitutionalists, the International & Great Northern Railway Company would permit interchange of equipment and lading. It further appears that the Constitutionalist representatives called upon Mr. De Wolf, General Superintendent of Texas Mexican Railway Company, and demanded that he permit them to cross the bridge for the purpose of making interchange of traffic with the International & Great Northern Railway Company, and he declined to do so, stating that it would be necessary for them to have an order from the federal government at Mexico City before he could permit them to use the bridge, and that under his instructions from Mr. Brown he could not permit them to cross. One of the representatives of the Constitutionalists' railways stated in his affidavit that, if any foreign railroad would agree to let its cars go into Mexico, his road was able and willing to secure the owners of the cars for their safe return. It does not appear that this offer was communicated to appellant.

The trial court, on ex parte hearing, without notice to the railway, appointed a receiver on August 10, 1914, who qualified on August 11, 1914. On August 12th, railway company gave notice of appeal, and the court fixed the amount of the supersedeas bond. Such bond was given, approved, and filed on August 13th. The record was filed in this court on August 29, 1914. No motion was made to advance the case, and when set for submission on December 5, 1914, both parties filed a motion requesting that the submission be postponed until the first submission day in February, 1914, which request was complied with by this court. The order appointing the receiver recites that the receiver is to operate all of the properties so as to perform the public duties owed by the defendant, and so as to preserve and protect the interests of the defendant and its creditors in its properties. It further recites that he has to operate all and every portion of such properties as a common carrier, including the operation of the main line from the terminus thereof on the Texas state line near Laredo to its other terminus, and receive, transport, deliver freight and passengers, and interchange freight and passenger traffic and loaded and empty cars with each and all of connecting carriers, including the National Railways of Mexico, at the junction of the lines of defendant with the line of said National Railways of Mexico at the Texas state line.

[1-3] Appellant railway contends that the court erred in appointing a receiver without notice to it. The damage and inconvenience occasioned to the public and the business interests by the failure of appellant to interchange traffic with those in charge of the National Railways is relied upon by appellee as showing an emergency justifying the appointment being made without notice. We say this because it is apparent that for appellant to operate its line to the middle of the bridge would not provide an adequate remedy for the ills complained of, because it would be impracticable to unload and reload at the middle of the bridge. Nor can it be contended that the middle of the bridge is such a place as is meant in our statutes requiring the erection of suitable buildings or inclosures for the protection of freight. R. R. Com. v. C., R. I. & G. Ry. Co., 102 Tex. 397, 117 S. W. 794.

The contention, in so far as it relates to the emergency, resolves itself into the proposition that the state undertakes to compel a railroad company to interchange freight and passenger traffic, loaded and empty cars, with representatives of a faction carrying on a revolutionary war in Mexico, which faction is not shown to be legally entitled to the possession of National Railways, and is not recognized by the United States government, but wishes to interchange freight and pas-

sengers without the consent of the president of National Railways. This implies that appellant must interchange traffic with whoever is in physical control of National Railways, provided such parties give security for the return of equipment. These propositions are so far reaching that it occurs to us the trial court might well have given appellant an opportunity to be heard, especially as it is alleged that the conditions creating the emergency had existed for several months. The International & Great Northern Railway Company recognized the fact that conditions were so unsettled in Mexico as to make it inadvisable for it to permit its equipment to go into that country, unless appellant would recognize National Railways as a part of its system though in the hands of persons who had taken possession thereof under orders of Gen. Carranza. In other words, the International & Great Northern Railway representatives appeared to desire that appellant stand between them and any possible loss. What kind of security the Constitutionalists were willing to give is not disclosed, and we can imagine a railroad company being so situated that its equipment being returned, and promptly at that, is of more importance than to have security for the payment therefor if it is not returned. True, interchange of traffic had been going on at Brownsville and Eagle Pass, but the fact that other companies were willing to make such interchange does not prove that appellant can legally be required to do so. However, if it can be required to do so, and it has violated our statutes in failing to do so, it has subjected itself to the payment of the penalties provided by article 6615, and in addition it can be required by mandamus or mandatory injunction to discharge its duties. State of Texas v. Sugarland Ry. Co., 163 S. W. 1047. The attorneys representing the state urge that such remedies are not effective, that the appellant is dominated by National Railways, and means will be found to render ineffective such remedies if applied. Their argument in this connection appears to us to be rather far-fetched, and does not show such a likelihood of said remedies proving ineffective as to justify the appointment of a receiver without notice.

The emergency relied upon has a direct effect upon the finances of appellant which are alleged to already be in such condition as to render it insolvent or in imminent danger of insolvency, and it is urged that it is deliberately incurring further losses, and therefore the court was justified in appointing a receiver without notice. The suit is not brought by any creditor in danger of losing his debt because of insolvency or imminent danger of insolvency of appellant railway, but by the state for the purpose of forfeiting the charter, and article 1201 (R. S. 1911) is pleaded. While attorneys for the state rely upon that article as a warrant for forfeiting the charter, they do not rely upon

the succeeding articles for authority to appoint a receiver without notice, but rely upon article 2128, which relates to receiverships in general. Article 1202 reads in part:

"And the court trying said cause, after the corporation has been shown to be insolvent, may, in its discretion, appoint a receiver."

This provision authorizes the appointment of a receiver after the cause is tried. Article 1203, after providing that parties owning 25 per cent. of the stock of an insolvent corporation or creditors owning 25 per cent. of its indebtedness may sue for the dissolution of the corporation, and providing that leave shall be obtained from the judge before any petition shall be filed under articles 1202 or 1203, reads as follows:

"And it is further provided that any such corporation proceeded against shall have ten full days' notice prior to the day set for hearing, on an application for the appointment of a receiver."

Attorneys for the state urge that such provision relates back to article 1202, and means that, when a receiver is appointed by the court trying the cause, 10 days' notice shall be given; that any other construction would destroy article 1204, which provides that the rights and remedies given by the chapter are cumulative. It is indeed difficult to determine the intention of the Legislature, but it does not seem possible that it would provide for 10 days' notice to have been given before a receiver could be appointed upon judgment of forfeiture of charter. As a usual thing, the petition would contain a prayer for the appointment of a receiver, and notice for 10 days would be given by service of citation; but surely, if not prayed for in the petition, the Legislature did not intend that if a trial amendment was filed asking such relief the court would have to postpone for 10 full days the matter of appointing a receiver. It would be manifestly absurd to require such notice before a receiver could be appointed upon an adjudication upon the merits, and yet permit the appointment of a receiver by the judge in vacation without any notice. We do not think the Legislature intended such a radical departure from the long-established practice of the courts of our state. The intention must be that the 10 days should apply to appointments made by the judge, upon the petition being presented to him, and not to adjudication upon the merits. But if the contention of attorneys for the state is correct, and article 2128 is the only one to which we should look, then we say that, while said article does not provide for notice, our courts have uniformly held that notice should be given except in cases of emergency, and we do not think the insolvency of the corporation, or its imminent danger of insolvency, created such an emergency as justified the court in appointing the receiver without notice. This not being a suit by a creditor, or any one interested in the assets of the corporation, but by the state for the forfeiture of the charter, the financial condition of the corporation, or

even the fact that its course of conduct was leading it into further financial losses, did not create such an emergency as justified the receivership being instituted without notice.

The allegations relating to a consolidation of appellant with National Railways add nothing in the way of showing such an emergency as to justify the appointment of the receiver to be made without notice.

We are not unmindful of the gravity of the charges brought against appellant; but, as in all cases the remedy of receivership is to be cautiously applied, we conclude, for the reasons above given, that we should set aside the order appointing the receiver and remand the cause in order that appellant may have an opportunity to be heard.

Reversed and remanded.