STATE v. ST. LOUIS S. W. RY. CO. OF TEXAS et al. (No. 5726.)

(Court of Civil Appeals of Texas. Austin. June 25, 1917. On Motion for Rehearing, Oct. 24, 1917.)

1. ATTORNEY GENERAL ⊂⊃7—ANTI-PASS LAW —POWER OF ATTORNEY GENERAL TO SUE TO PREVENT UNJUST DISCRIMINATION.

Under Const. art. 4, § 22, as to powers of Attorney General, Const. art. 10, § 2, prohibiting unjust discrimination, and Acts 30th Leg. c. 42, § 9, requiring Attorney General to enforce the penalties of the provisions of the Anti-Pass Law, the Attorney General was authorized to institute a suit to enjoin railroads of the state from granting passes to persons under unconstitutional exception in the Anti-Pass Law (Acts 30th Leg. c. 42, as amended by Acts 32d Leg. c. 83).

2. CONSTITUTIONAL LAW ⊂⊃55—ANTI-PASS LAW — UNLAWFUL DISCRIMINATION — "UNJUST."

Under Const. art. 10, § 2, prohibiting unjust discriminations, whether granting of passes by railroads to classes of persons excepted in the Anti-Pass Law (Acts 30th Leg. c. 42, § 2, as amended by Acts 32d Leg. c. 83) is unjust discrimination is a judicial question and not one of fact to be determined by the Legislature conclusively; the word "unjust" having a well-known signification as meaning "contrary to what is just; not conforming to the standard of just and right; not legitimate; or unfair, unjust—as unjust laws or claims."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unjust.]

3. CARRIERS ⊂⊃2—ANTI-PASS LAW—EXEMPTIONS.

Under Const. art. 10, § 2, prohibiting unjust discrimination, and Vernon's Sayles' Ann. Civ. St. 1914, art. 6670, defining unjust discrimination, the exemptions from the operation of the Anti-Pass Law (Acts 30th Leg. c. 42, as amended by Acts 32d Leg. c. 83), contained in section 2 of the act, are void except as to employés and their families, etc.; necessary caretakers; indigent poor; Confederate veterans; persons injured in wrecks, and physicians and nurses attending them; persons and property carried in general epidemic; articles sent to orphan home, etc.; special rates authorized by the railroad commission; exchange privileges to bone fide officers and employés, and exchange of mileage for advertising space.

On Rehearing.

4. CARRIERS ⊂⊃13(1) — UNJUST DISCRIMINATION—CONSTITUTIONAL PROVISION.

Const. art. 10, § 2, directing the Legislature to pass laws to prevent unjust discrimination in railroad rates, is equivalent to a direct prohibition of unjust discrimination by railroads in either freight or passenger tariffs.

5. CARRIERS ⊂⊃13(2) — UNJUST DISCRIMINATION — CONSTITUTIONAL PROVISION — CONSTRUCTION.

The doctrine that, if a common carrier does not charge one person more than the law permits, its rendition of similar service for others without charge is not unjust discrimination, does not apply in construing Const. art. 10, § 2, prohibiting unjust discrimination.

6. CONSTITUTIONAL LAW ⊂⊃14 — CONSTRUCTION.

The Constitution having been adopted by popular vote and not by legislative action, its provisions are to be construed as they were understood by the average voter voting on such adoption.

7. CONSTITUTIONAL LAW ⊂⊃67—SEPARATION OF POWERS—ENCROACHMENT BY JUDICIARY.

Notwithstanding the theory of separation of powers, courts have the power, and in some cases are under the duty, to determine whether or not the official action of other departments of the government contravenes the Constitution, and. if so, to declare such action invalid.

Appeal from District Court, Travis County; Chas. A. Wilcox, Judge.

Action by the State of Texas against the St. Louis Southwestern Railway Company of Texas and others. From a judgment for defendants, plaintiff appeals. Reversed and rendered.

B. F. Looney, Atty. Gen., and C. M. Cureton and Luther Nickels, Asst. Attys. Gen., for the State. Hiram Glass, of Austin, E. B. Perkins, of Dallas, and Geo. Thompson, of Ft. Worth, for appellees.

Statement of the Case.

RICE, J. In 1907 the Legislature enacted what is commonly known as the "Anti-Pass Law" (Acts of the 30th Legislature, page 93), and, as amended by the Acts of 1911, of the 32d Legislature, page 151, reads as follows, to wit:

"Section 1. That if any steam or electric railway company, street railway company, interurban railway company or other chartered transportation company, express company, sleeping car company, telegraph or telephone company or person or association of persons operating the same or the receivers or lessees thereof or any officer, agent or employé of any such company in this state, shall knowingly haul or carry any person or property free of charge, or give or grant to any person, firm, association of persons, or corporation, a free pass, frank, a privilege or a substitute for pay or a subterfuge which is used or which is given to be used instead of the regular fare or rate for transportation, or any authority or permit whatsoever to travel or to pass or convey or transport any person or property free, or sell any transportation for anything except money or for any greater or less rate than is charged to all persons under the same conditions, over any railway or other transportation line or part of line in this state; or shall knowingly permit any person to transmit any message free in this state or shall give any frank or right or privilege to transmit messages free in this state, or property free of charge or for greater or less fare or rate than is charged other persons in this state for similar service; except such persons as are hereinafter exempted under the provisions of this act, shall be guilty of a misdemeanor, and, upon conviction in any action brought on this account, and for that purpose, shall pay to the state of Texas the sum of five thousand dollars ($5,000.00) for each and every act which violates the provisions of this section; and any person, president, director, officer, employé or agent of any such corporation or association of persons who shall sell any transportation for anything except money or knowingly give, grant, issue or cause to be issued a free pass, a frank, a privilege or any substitute for or in lieu thereof for the transportation of any person, article or thing or the sending or transmitting any messages over wire or other means of transmitting messages in this state except to such persons as are hereinafter exempted from the provisions of this act,

shall be deemed guilty of a felony under the laws of this state, and upon conviction for such act shall be punished by a fine of not less than five hundred dollars ($500.00) nor more than two thousand dollars ($2,000.00), and may in addition thereto, in the discretion of the jury, be imprisoned in the penitentiary, for a term of not less than six (6) months nor more than two (2) years.

"Sec. 2. That the provisions of section 1 of this act shall not be held to prohibit any steam or electric interurban railway, telegraph company or chartered transportation company or sleeping car company or the receivers or lessees thereof or persons operating the same, or the officers, agents or employés thereof from granting free or exchanging free passes, franks, privileges, substitute for pay or other thing herein prohibited to the following persons: The actual bona fide employés of any such companies and the members of their families. The term employés shall be construed to embrace the following persons only: All persons actually employed and engaged in the service of any such companies, including its officers, bona fide ticket, passenger and freight agents, physicians, surgeons, and general attorneys, and attorneys who appear in courts to try cases and who receive a reasonable annual salary; furloughed, pensioned, and superannuated employés; persons who have become disabled or infirm in the service of any such common carrier, and the remains of a person killed in the employment of a carrier, and ex-employés traveling for the purpose of entering the service of any such common carrier. And the term families as used in this paragraph shall include the families of the persons named in this provision; also the families of persons killed while in the service of any such common carrier; also persons actually employed on sleeping cars, express cars, also officers and employés of telegraph and telephone companies, newsboys employed on trains, railway mail service employés and their families, post office inspectors, chairmen and bona fide members of grievance committees of employés, bona fide custom and immigration inspectors employed by the government, the state health officer, and one assistant, and federal health officers, county health officers, the state railroad commissioners, state superintendent of public buildings and grounds, the state game, fish and oyster commissioner and his two chief deputies; also government representatives accompanying from the Texas fish hatcheries shipments of fish for free distribution in the waters of this state; the dairy and food commissioner and two chief deputies; also when live stock, poultry, fruit, melons or other perishable produce is shipped, the necessary caretakers while en route and return; also trip passes to the indigent poor when application therefor is made by any religious or charitable organization; Sisters of Charity, or members of any religious society of like character; delegates to the different farmers' institutes and farmers' congresses and farmers' unions; also all delegates to the state and district firemen's conventions from volunteer fire companies and Confederate veterans who are or have been or who hereafter may be admitted to the Confederate Home; managers of Young Men's Christian Associations or other eleemosynary institutions while engaged in charitable work; also the officers or employés of industrial fairs during the continuance of any said fair and six months prior thereto; provided, that no more than four officers or employés of any one fair or fair associations shall receive passage in any one year; also persons injured in wrecks upon the road of any such company immediately after such injury, and the physicians and nurses attending such persons at the time thereof; also persons and property carried in cases of general epidemic, pestilence or other calamitous visitations at the time thereof or immediately thereafter; also the United States marshals and

not more than two deputies of each such marshal; state rangers; constables; the members of the state militia in uniform and when called into service for the state; sheriffs and not more than two deputies to each constable or sheriff; chiefs of police or city marshals, whether elective or appointive. Any bona fide policeman or fireman in the service of any city or town in Texas may have the right to ride upon free transportation furnished by any steam railroad company, any street railway company, any interurban railway company, or other lines of public transportation, when such policeman or fireman is in the discharge of his public duty; but this provision shall not be construed so as to apply to men holding commissions as special policemen or firemen. Any other bona fide peace officer shall enjoy the same privilege, when their duties are to execute criminal processes; provided, that if any such railroad or transportation company shall grant to any sheriff a free pass over its lines of railroad, then it shall issue like free transportation to each and every sheriff in this state who may make to it written application therefor; and provided, further, that said sheriffs and other peace officers above mentioned using such free passes or transportation shall deduct the money value of the same, at the legal rate per mile, from any mileage accounts against the state, and litigants earned by them in executing process when such pass was used or could have been used; also members of the Live Stock Sanitary Commission or their inspectors, of Texas, not exceeding twenty-five (25) in number for any one year; any person who has by many years of actual labor aided, assisted and been instrumental in securing the passage of statutes by the Congress of the United States requiring the equipment of railroad trains with adequate safety appliances for the protection of the persons and lives of the employés and passengers; provided, that such person was not at such time a public officer, national, state or local, nor employed directly or indirectly by any railroad company; provided, that nothing in this act shall prevent any such companies, the receivers or lessees thereof and their families or the officers, agents or employés from granting to ministers of religion reduced rates of one-half (½) the regular fare, nor shall anything in this act prevent any such companies, their receivers or lessees from transporting free of charge any article being sent to any orphan home or other charitable institution; provided, further, that nothing in this act shall be construed to prohibit any such companies, their receivers or lessees or officers, agents or servants from making special rates for special occasions or under special conditions, but no such rate shall ever be made without first obtaining authority from the railroad commission of Texas; and provided further, that no persons who hold any public office in this state shall at any time during their term of office be entitled to any such pass or transportation, privilege or franks or substitute for fare or charges over any railway or other company mentioned in section one (1) of this act, except employés operating trains when in the actual discharge of their duties as such and the officers hereinbefore exempted; provided, further, that nothing in this act shall prohibit any street railway company from transporting, free of charge, police officers and firemen in any city where said company is authorized so to do by any ordinance or authority from the city council of any such city; provided, however, that no person or persons, beneficiaries of free transportation herein permitted, shall ride on a free pass or enjoy free transportation to or from any political convention or on any political errand; that nothing in this act shall prohibit any express company from hauling or carrying free of charge the packages and property of its actual and bona fide officers, attorneys, agents and employés who are actually in the employment of any such

company, its receivers or lessees, at the time such free transportation or the right thereto was given; and provided, further, that nothing in this act shall be construed to prohibit any telegraph or telephone company from carrying and transmitting free of charge the messages of its bona fide officers, attorneys, agents and employés and their families who are actually in the employment of such company, its receivers or lessees at the time when such free transportation or the right thereto was given; provided, the actual bona fide officers and employés upon annual salaries of railway and telephone companies, and telegraph companies are hereby permitted to exchange franks, privileges and free transportation over their respective lines of railway and telegraph or telephone; and provided, further, that nothing in this act shall be construed to prevent the right of contract between [the] railway companies and publishers, editors or proprietors of newspapers or magazines from making an exchange of mileage for advertising space in such newspapers or magazines; and provided, further, that the contract between the railway companies and publishers, editors or proprietors of such newspapers shall be upon the same basis of charge as is charged the public generally for a like service, and that the said exchange shall be on a basis of value received in all cases, and providing that such contract shall be in writing and shall not be operative until approved by the railroad commission of this state and filed in the office of the commission as a part of the records thereof, subject at all reasonable times to public inspection; and that nothing herein contained shall be construed to prevent railway, express, railway news and other companies, persons and corporations performing service for or in connection with the operation of railways, from issuing to or exchanging with each other, franks, passage and free transportation of persons and property to each other and to their respective company's officers and employés for the use of the respective facilities; provided, that nothing herein contained shall be construed to prohibit actual bona fide employés from riding on a pass if he at the same time holds the position of school trustee or notary public."

Our state Constitution, § 2, art. 10, declares that:

"Railroads heretofore constructed, or which may hereafter be constructed, in this state are hereby declared public highways, and railroad companies common carriers. The Legislature shall pass laws to regulate railroad freight and passenger tariffs, to correct abuses and to prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this state, and enforce the same by adequate penalties; and, to the further accomplishment of these objects and purposes may provide and establish all requisite means and agencies invested with such powers as may be deemed adequate and advisable."

That the Legislature, in 1883, prescribed the maximum passenger rate for adults at three cents per mile, which statute was reenacted in 1895, and again in 1911. See article 6618, Vernon's Sayles' Civil Statutes, vol. 4.

The Legislature in defining "unjust discrimination" declares that:

"If any railroad [company], subject hereto, directly or indirectly, or by any special rate, rebate, drawback, or other device, shall charge, demand, collect or receive from any person, firm or corporation a greater or less compensation for any service rendered or to be rendered by it than it charges, demands, collects or receives from any other person, firm or corporation for doing a like and contemporaneous service, such railroad shall be deemed guilty of unjust discrimination, which is hereby prohibited.

"1. Same.—It shall also be an unjust discrimination for any such railroad to make or give any undue or unreasoable preference or advantage to any particular person, company, firm, corporation or locality, or to subject any particular description of traffic to any undue or unreasonable prejudice, delay or disadvantage in any respect whatsoever.

"2. Same.—Every railroad company which, shall fail or refuse, under such regulations as may be prescribed by the commission, to receive and transport without delay or discrimination the passengers, tonnage and cars, loaded or empty, of any connecting line of railroad, and every railroad which shall, under such regulations as may be prescribed by the commission, fail or refuse to transport and deliver without delay or discrimination any passengers, tonnage or cars, loaded or empty, destined to any point on or over the line of any connecting line of railroad, shall be deemed guilty of unjust discrimination; provided, perishable freights of all kinds and live stock shall have precedence of shipment.

"3. Same.—It shall also be an unjust discrimination for any railroad subject hereto to charge or receive any greater compensation in the aggregate for the transportation of like kind of property or passengers for the shorter than for a longer distance over the same line; provided, that upon application to the commission any railroad may in special cases, to prevent manifest injury, be authorized by the commission to charge less for longer than for shorter distances for transporting persons and property, and the commission shall from time to time prescribe the extent to which such designated railroad may be relieved from the operations of this provision; provided, that no manifest injustice shall be imposed upon any citizen at intermediate points; provided further, that nothing herein shall be so construed as to prevent the commission from making what are known as 'group rates' on any line or lines of railroad in this state.

"4. Penalty for Unjust Discrimination.—Any railroad company violating any provision of this article shall be deemed guilty of unjust discrimination, and shall for each offense pay to the state of Texas a penalty of not less than five hundred dollars nor more than five thousand dollars.

"5. Law Does Not Apply, When.—Nothing herein shall prevent the carriage, storage or handling of freight free or at reduced rates, or to prevent railroads from giving free transportation or reduced transportation, under such circumstances and to such persons as may be allowed or permitted by the law of this state."

See article 6670, Vernon's Sayles' Civil Statutes, vol. 4.

This suit was brought by the Attorney General in the name and behalf of the state against the St. Louis Southwestern Ry. Co. of Texas and the other appellees, constituting the principal railways of Texas, seeking to restrain them from issuing and continuing to issue and permitting the use of free passes, under the authority of section 2 of the act above set out; alleging, as stated in its brief, that the companies for many years had been issuing passes to individuals, and, since the passage of the Anti-Pass Law in 1907, and the act of 1911 amendatory thereof, had been issuing passes to individuals coming within the descriptions made in the exceptions contained in section 2 of the act of 1907, as amended as aforesaid, and that the com-

panies propose to and will, unless restrained, continue issuing such passes in the future. The amount of such free transportation for each of the last 10 years is stated, and it is shown that an average of 18,721,969 pay passengers and 2,348,188 free passengers, per year have been carried by such railroads; that the average "revenue" mileage was 994,659,999; the average "free" mileage was 124,549,853; that the average rate of fare charged the pay passenger was 2.2952 cents per mile and that the value of the "free" mileage at this rate per year, averaged the sum of $3,097.538; that the average revenue collected from "pay" passengers was $22,916,418; that the average per cent. of the "free" to the total mileage was .11215 per cent.; that during the 10-year period a total of 187,219,295 "pay" and 23,481,884 "free" passengers were carried; that 9,946,599,990 "pay" and 1,245,498,534 "free" miles were traveled; that the revenue collected from this pay mileage was $229,164,181 and that the value of the "free" mileage at the same rate was $30,975,380.

It is further shown that if those traveling "free" had been charged the uniform rate of 2.0378 cents per mile it would have produced the same total revenue that was collected by the application of the average 2.2952-cent rate; and that if all had been charged, and the extra expense of keeping records pertaining to "free" travel had therefore been abrogated, etc., a rate less than 2 cents per mile could have produced as much revenue as the 2.2952-cent rate produced.

It was further alleged that the "service performed by a railroad company in the 'mere transportation of a "free" passenger' costs the company as much, in expenses of operation, as it costs the company to transport a 'pay' passenger, and the company is compelled to and does embrace the expense of the transportation of all 'free' passengers in its 'operating expenses'"; that extra expense is incurred in keeping records of free travel which amounts to many thousands of dollars per year; that the companies incur substantially the same liability for personal injuries to "free" as to "pay" passengers, and that, proportionately, as many "free" as "pay" passengers are injured, and that the companies are thereby compelled to pay many thousands of dollars per year because of liabilities incurred to "free" passengers; that many thousands of tons of baggage, etc., are transported free for the "free" passengers at thousands of dollars of expense to the companies—all of which expenses must be borne by the companies and charged to "operating expenses," and become, therefore, a charge upon the railroad traffic of Texas.

It was also alleged that the total bonded indebtedness of Texas railroads was $354,757,696, with an annual interest charge of $16,972,968.25, and that their total capital stock was $128,540,728; that the value of

197 S.W.—64

the "free" mileage for the 10-year period would have paid one dividend of .241 per cent., or an annual dividend on the stock of .0241 per cent.; the value of the "free" mileage for the 10-year period would have paid the annual interest on the bonds for 1.82 years. The total taxes paid by the railroads in Texas for the year 1913 amounted to $3,925,675.13; the value of the "free" mileage for the same year was $3,582,528; the value of the "free" mileage amounted to $273 per mile of road operated during each of the 10 years, or $2,738 per mile for the whole 10 years.

The suit, as shown by the state's brief, is based upon the theory that some, or all, of the exceptions in article 2 of the above act of 1911—except those in favor of employés—are void under the constitutional provisions above quoted, and that therefore the issuance of passes thereunder is illegal under the terms of the remainder of the Anti-Pass Law, and the further issuance of such passes constituted "unjust discrimination," and therefore should be enjoined.

The prayer of the petition is in the alternative: (1) That the appellees be restrained from granting or issuing free passes to anybody—except bona fide employés, etc.; (2) that they be restrained from issuing passes to persons included in any "exception" that may be found to be void.

Appellees answered by general demurrer, special demurrers, with a general denial, special answers to the effect that they had not been guilty of "unjust discrimination," and that the passes issued by them were issued to persons authorized to receive the same by the Anti-Pass Law; that the definition of unjust discrimination as made by the Legislature in the enactment of this law is beyond judicial control, and that the Attorney General has no authority to maintain a suit to have the exceptions declared void.

Upon the trial the parties entered into the following agreement:

"Now come the parties to the above-entitled cause and agree that if the demurrers of the defendants therein are not sustained, and that the same is to be heard on its merits, that the following are all of the material facts necessary to the determination of all of the issues in said cause:

"(1) Each of the defendants railway companies has issued free transportation to the persons embraced in the second section of the act of 1907, commonly known as the Anti-Pass Law, and the amendment thereto enacted in 1911, which article is now article 1533, Penal Code of 1911.

"(2) That each of said railway companies, defendant herein, have transported passengers over their lines of railway free of charge, where such passengers hold free passes issued in accordance with said laws referred to in the first paragraph hereof.

"(3) That each of said railway companies will continue, upon request, to issue such free transportation and transport such passengers in the future, unless restrained by the order of this court.

"(4) The above and foregoing admissions shall not be construed as admitting the truth of any

other allegations in plaintiff's petition contained."

The case was tried before the court without a jury and judgment rendered sustaining the demurrer, and likewise containing a recitation that the court, further considering the evidence, is also of the opinion that judgment should be rendered for the defendants, which was accordingly done, denying the state all relief, from which judgment this appeal is prosecuted on behalf of the state.

### Opinion.

The only question for consideration involved in this appeal is whether or not the general demurrer was properly sustained. If it was the case should be affirmed; if not, it becomes our duty to reverse and render the judgment in favor of the state.

In the determination of this question there are two points presented for our consideration by the record and briefs of counsel: First, whether or not the Attorney General had the authority to bring this suit, and, second, if so, whether or not the court erred in rendering judgment in favor of the defendants, because all of the exceptions contained in section 2, chapter 42, General Laws of Texas 1907, page 93, as amended, except that in favor of bona fide employés, officers, and agents, are each and all unconstitutional and void as being in contravention of section 3, art. 1; section 2, art. 10; section 28, art. 1, of the Constitution of the state of Texas, and the Fourteenth Amendment of the Constitution of the United States. It may be remarked in passing, however, that, in the event we hold that such exceptions are unconstitutional because in violation of the articles named, then it follows, we think, as a matter of course, that the Attorney General was authorized to bring the suit. But irrespective of such constitutional provisions, it is insisted on the part of the state that the Attorney General was expressly authorized to bring this suit, first, because of the public interests involved, and the resultant public injury if no such authority was held to exist. Railway companies possess the right of eminent domain, are declared to be public highways, and are common carriers, and it is unnecessary to cite authorities showing that they are subject to lawful regulations on the part of the state. This being true, it follows that such regulations are enforceable by the state through its properly constituted officers.

Our Constitution (section 22, art. 4), in relation to the powers of the Attorney General, prescribes that:

"He shall represent the state in all suits and pleas in the Supreme Court of the state in which the state may be a party, and shall especially inquire into the charter rights of all private corporations, and, from time to time in the name of the state, take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power, or demanding or collecting any species of taxes, toll, freight or wharfage, not authorized by law."

So that if it appears from the allegations of the petition, as we think it does, that such corporations were exercising or undertaking to exercise any power not authorized by law, then it became his duty to institute such suit as might be necessary to prevent defendants from exercising such unlawful authority.

[1] In addition to this, section 9 of the Anti-Pass Law, as above set out, makes it the special duty of the Attorney General to see that the provisions of said act are enforced and obeyed, and the penalties for its violation recovered and collected. So that if the exceptions contained in section 2 of the act of 1907, as amended by the Acts of 1911, constituted an "unjust discrimination" in favor of the parties named, as against the general public as alleged in the petition, which is prohibited by section 2, art. 10 of the Constitution, then we think it clear that the Attorney General was duly authorized to institute this suit, and that his action in so doing is sustained by the following authorities: § 22, art. 4, Constitution —Powers of the Attorney General; § 2, art. 10, Constitution— Unjust Discrimination Prohibited; § 9, c. 42, General Laws 1907, p. 93; K. C., M. & O. Ry. Co. of Tex. v. State, 155 S. W. 561, 106 Tex. 249, 163 S. W. 582; State v. Sugarland Ry. Co., 163 S. W. 1047; Tex. Mex. Ry. Co. v. State, 174 S. W. 298; I. & G. N. Ry. Co. v. Anderson County, 106 Tex. 60, 156 S. W. 502; W. U. Tel. Co. v. State, 121 S. W. 194; G., C. & S. F. Ry. Co. v. State, 72 Tex. 404, 10 S. W. 81, 1 L. R. A. 849, 13 Am. St. Rep. 815; State v. So. Pac. R. R. Co., 24 Tex. 80; State v. Country Club, 173 S. W. 570; S. A., etc., Ry. Co. v. State, 90 Tex. 520, 39 S. W. 926, 35 L. R. A. 662, 59 Am. St. Rep. 884; Attorney Gen. v. Ry. Co., 35 Wis. 425–553; State v. Pac. Exp. Co., 80 Neb. 823, 115 N. W. 619, 18 L. R. A. (N. S.) 664; Campbell v. Chicago, etc., Ry. Co., 86 Iowa, 587, 53 N. W. 351, 17 L. R. A. 443, 444; State v. M., J. & K. C. Ry. Co., 86 Miss. 200, 38 South. 732, 122 Am. St. Rep. 277; State v. Union Pac. Ry. Co., 87 Neb. 29, 126 N. W. 859, 31 L. R. A. (N. S.) 657.

We will therefore proceed to the discussion of the second point presented by the demurrer, which we think is the chief question involved in this appeal, and that is as to the authority of the railway company to issue free passes to the persons named in section 2 of the act of 1907, as amended by the Acts of 1911 above set out—the answer to which involves the question of the constitutionality of such section.

[2] It is contended by the state that the Legislature was without authority in the enactment of such exceptions, because section 2, art. 10 of our state Constitution, heretofore set out, contained, among other things, a provision that it shall be the duty of the

Legislature to prevent "unjust discrimination and extortion," and it is contended that to charge one person three cents per mile, as permitted by law, while another enjoys the privilege under this exception of riding without pay, is an unjust discrimination, and therefore prohibited by this section of our organic law. While, on the other hand, it is asserted with great zeal and much plausibility that the Constitution reposes in the Legislature the discretion of determining what is unjust discrimination, and having determined that permitting railroad companies to grant free passes to the persons named is, in effect, saying that in fact such discrimination is not unjust. We think it goes without saying that this law permits the companies to discriminate in favor of the persons named. The question is, Is this discrimination unjust? The word "unjust" has a well-known signification. It means, "contrary to what is just; not conforming to the standard of just and right; not legitimate; or unfair, unjust—as unjust laws or claims."

Railway companies, being common carriers, are under obligation to carry all passengers for the same charge for similar services, and cannot make unjust discrimination in favor of one as against others (Elliott on Railroads, § 1467, vol. 4), nor by issuing free passes (vol. 4, § 1612). And unjust discrimination is unlawful even in the absence of a statute or constitutional provision making it so, by reason of the fact that it was forbidden by the common law. 4 Elliott, §§ 1467-68. But as to what is "unjust discrimination" the authorities differ.

It is said that:

"Arbitrary discriminations alone are unjust. If the difference in rates be based upon a reasonable and fair difference in conditions which equitably and logically justify a different rate, it is not an unjust discrimination." See State v. M., K. & T. Ry. Co., 262 Mo. 507, 172 S. W. 40, L. R. A. 1915C, 778, Ann. Cas. 1916E, 949, and authorities there cited.

But we think it unnecessary to go outside of our own statute to find the proper definition of this term, because unjust discrimination has been defined by our Legislature as prescribed in article 6670, above set out, to be:

"If any railroad subject hereto, directly or indirectly, or by any special rate, rebate, drawback, or other device, shall charge, demand, collect or receive from any person, firm or corporation, a greater or less compensation for any service rendered or to be rendered by it than it charges, demands, collects or receives from any other person, firm or corporation for doing a like and contemporaneous service, such railroad shall be deemed guilty of unjust discrimination, which is hereby prohibited."

Since, therefore, the companies under the statute above quoted are permitted to charge, and do charge, the regular fare of three cents per mile for adult passengers, which prima facie is a reasonable rate, the granting to the persons named in section 2 the right to ride free of charge, such act on the part of the company is not only a discrimination in their favor against the general public, but we think is clearly an unjust discrimination as determined by the statute, and is therefore prohibited by the constitutional provisions in question, unless as to some of the persons mentioned in section 2 that there was a proper basis for such classification, which will hereafter be considered.

If, therefore, the Legislature had no authority to engraft the exceptions set out in section 2 of the Anti-Pass Law, because they were an unjust discrimination in favor of such persons as against the general public, and therefore forbidden by section 2, art. 10 of our Constitution, prohibiting unjust discrimination, then we think it follows that such exceptions are unlawful, and that the court erred in sustaining the demurrer to the petition.

Also see the following authorities: § 2, art. 10, Constitution; M., K. & T. Ry. Co. v. State, 262 Mo. 507, 172 S. W. 35, L. R. A. 1915C, 778, Ann. Cas. 1916E, 949; Lake Shore, etc., Ry. Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858; Wisconsin, etc., Ry. Co. v. Jacobson, 179 U. S. 287, 301, 21 Sup. Ct. 115, 45 L. Ed. 194; Commonwealth v. Atlantic Coast Line, 106 Va. 61, 55 S. E. 572, 7 L. R. A. (N. S.) 1086, 117 Am. St. Rep. 983, 9 Ann. Cas. 1124; A., T. & S. F. Ry. Co. v. Campbell, 61 Kan. 439, 59 Pac. 1051, 48 L. R. A. 251, 78 Am. St. Rep. 328; McCully v. C., B. & Q. Ry. Co., 212 Mo. 1, 110 S. W. 711; In re Gardner, 84 Kan. 264, 113 Pac. 1054, 33 L. R. A. (N. S.) 956; Wilson v. United Traction Co., 72 App. Div. 233, 76 N. Y. Supp. 203; State v. Union Pac. Ry. Co., 87 Neb. 29, 126 N. W. 859, 31 L. R. A. (N. S.) 657; McDuffee v. Ry. Co., 52 N. H. 430, 13 Am. Rep. 72; Scofield v. Ry. Co., 43 Ohio St. 571, 3 N. E. 907, 54 Am. Rep. 846; Parsons v. Ry. Co., 167 U. S. 455, 17 Sup. Ct. 887, 42 L. Ed. 231; Dinsmore v. Ry. Co. (C. C.) 2 Fed. 469; Ry. Co. v. People, 56 Ill. 365, 8 Am. Rep. 690; Atwater v. Ry. Co., 48 N. J. Law, 55, 2 Atl. 803, 57 Am. Rep. 543.

While this presents a new question in this state, the point involved, as far as we are advised, never having been passed upon by our courts, still we are not wholly without light to guide us, since almost an exactly similar provision of the Constitution of the state of Missouri has been construed by the Supreme Court of that state in the case of State v. M., K. & T. Ry. Co., reported in 262 Mo. 507, 172 S. W. p. 35, L. R. A. 1915C, 778, Ann. Cas. 1916E, 949, where a mandamus was sought to compel said railroad company to grant transportation to members of the National Guard of said state at one cent per mile for each man belonging to the said organization, whenever said National Guard was ordered by the Governor of the state to travel on military duty in the state. The Legislature of said state passed a statute, to wit, Rev. St. Mo. 1909, § 8396, providing that:

"Whenever it shall be necessary for the organized militia of the state, designated the National Guard of Missouri, to travel on any railroad between points wholly within this state on military duty, ordered by the Governor, the rate charged shall not exceed one cent per mile for the transportation of each officer and enlisted man, with not to exceed one hundred pounds of baggage or camp equipage, and the individual, company or corporation owning, operating, controlling, or leasing such road or part thereof shall be limited to such compensation therefor, and shall not charge, demand or receive any greater rate or compensation for such service."

The court say, with reference to said statute, that:

"It is contended that since the Constitution in plain terms requires the Legislature to 'pass laws to * * * prevent unjust discrimination * * * in the rates of * * * passenger tariffs on the different railroads; by this language and the unmistakable command of its converse it forbids the Legislature to pass any law, the effect of which is to produce a plain, and an alleged unjust, discrimination. May the Legislature, having by the express command of the organic law a duty laid upon it to do a certain thing, not only fail to do that thing, but without any other authority from the Constitution do the diametrically contrary thing? We do not think so. Such a conclusion in the light of our Constitution would serve as the mother in logic of a pestiferous brood of vicious, absurd, and outrageous laws, which like chickens would come home to us to roost and vex us. For if the Legislature may validly pass a statute compelling the railroads to carry members of the organized militia for one cent per mile, and thus save to the state at the expense of the railroads one cent for each mile traveled, it may, by the same token, pass an act requiring such transportation to be furnished for one mill per mile; likewise it may pass a statute requiring all transportation, both of freight and passengers, moving at the ultimate expense of the state, to be furnished at a merely nominal cost."

The court in the above case held that the statute of Missouri above quoted was contrary to the constitutional provision of Missouri, which we find is similar to our own. It is true that article 2 of the act of 1907 merely permits railways to grant the passes to the persons named in the respective clauses, and does not require them to do so, and in this respect it is different from the statute of Missouri, which required the railway companies to furnish transportation to the National Guard at one cent per mile, but we think that the principle involved in both cases is the same. Our Constitution provides that the Legislature shall pass laws to prevent unjust discrimination. Certainly the converse of this is true—hence it has no power to pass laws granting such companies the right to permit unjust discrimination.

The case of Leach v. State (Cr. App.) 189 S. W. 733, in which appellant was prosecuted for riding upon the railway pass of another, Mr. Justice Davidson, in discussing the statute under consideration, said:

"There is another very serious question. The writer has not deemed it advisable to discuss the question now, being aware of the fact that the same question is before the civil courts, and doubtless will reach the Supreme Court for final adjudication; that is the constitutionality of the act, or that portion of the act under which appellant was indicted for using the free pass of another. The theory is that the act is unconstitutional in its being discriminating, granting a right to ride on passes to one class and not another class, and is not only unconstitutional, but arbitrarily so. The writer has read the briefs not only of counsel in this case, who are learned lawyers and have occupied high official position, but also a very able and lengthy brief prepared by the Attorney General's department to be used in a civil case, and but for the fact that the matter is to be determined finally by the civil courts of Texas, the writer would take it up and discuss it at length. But for himself he would state that he believes the law to be unconstitutional and in violation of article 10, section 2 of the state Constitution."

While this announcement on the part of Mr. Justice Davidson is not an authoritative expression of that court, still it is persuasive, and is cited for this reason.

It is urged, however, on the part of appellees, that the question of unlawful discrimination is one of fact to be determined by the Legislature under the constitutional provision above recited, and that, having determined that the granting to classes of persons named in article 2 of the act of 1907 was not an unjust discrimination, the courts have no right to review the question. We think that the constitutionality of this statute is a judicial question and not one of fact.

With reference to railroad rates, it is said by Noyes on the subject, pages 209, 210, that:

"Making rates is purely a legislative function, but under the pretense of regulating fares and freights the state cannot require a railroad to carry persons or property without reward; neither can it do that which in law amounts to the taking of private property for public use without just compensation or without due process of law. When the Legislature has acted, and has prescribed a tariff of charges, the question then arises whether its action is constitutional—whether it violates the Fourteenth Amendment, etc., which is purely a judicial question. The courts alone determine the constitutionality of laws, and the rate made by the legislative authority is a law, etc." See Noyes on Railroads, pages 209, 210.

Railroad Commission Cases, 116 U. S. 331, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 391, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819.

"The state may provide by legislation for maximum rates of charges for railroad companies, provided they are such as will admit of the carrier earning a compensation just to it and to the public; and whether they are or not is a judicial question." Lake Shore & Mich. So. Ry. Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858.

The exceptions in section 2 of the Anti-Pass Law are numerous, and, in our judgment, exempt from payment of railroad fare a large class of persons in whose behalf no satisfactory reason can be offered for permitting them to ride free. The petition charges, and for the purpose of this demurrer must be taken as true, that the regular three-cent rate could be considerably reduced, stating the amount of such reduction, provided all persons now permitted to ride free under the

law were compelled to pay the regular fare.

[3] For the reasons hereinbefore stated, we hold the demurrer was improperly sustained, and that all exemptions contained in section 2 of the act of 1907, amended in 1911, are void, except those relating to employés and their families, etc., which is not involved herein, and about which we express no opinion, and the following clauses thereof, which we permit to stand, because, in our judgment, there are good and satisfactory reasons for the basis of such classification, to wit:

(1) When live stock, poultry, melons, or other perishable produce is shipped *the necessary caretakers while en route and return.* (Italics are ours.)

(2) Trip passes to the indigent poor when application therefor is made by any religious or charitable organization.

(3) Confederate veterans who are, or have been, or who hereafter may be, admitted to the Confederate Home.

(4) To persons injured in wrecks upon the road of any such company immediately after such injury, and the physicians and nurses attending such persons at the time thereof.

(5) Also persons and property carried in cases of general epidemic, pestilence or other calamitous visitations at the time thereof, or immediately thereafter.

(6) That clause thereof permitting the companies, or their receivers, or lessees, transporting free of charge any article being sent to any orphan home, or other charitable institution.

(7) Nor are such companies, their receivers, or lessees, or officers, agents, or servants prohibited from making special rates for special occasions under special conditions, but no such rate shall ever be made without first obtaining authority from the railroad commission of Texas.

(8) Actual bona fide officers and employés of such companies are permitted to exchange franks, privileges, and free transportation over their respective lines of railway.

(9) Also that clause providing that nothing in this act shall be construed to prevent the right of contract between railway companies and publishers, editors, or proprietors of newspapers or magazines making an exchange of mileage for advertising space in such newspapers and magazines, provided that the contract between such companies and publishers, editors, or proprietors of such newspapers shall be upon the same basis of charge as is charged the public generally for like service, and that the said exchange shall be on the basis of value received in all cases, and provided that such contract shall be in writing and shall not be operative until approved by the railroad commission of this state and filed in the office of the railroad commission, as a part of the records thereof, subject at all reasonable times to public inspection."

Before closing this opinion, we wish to acknowledge the aid we have received from the able and elaborate briefs and arguments of counsel for both parties, and to express our appreciation thereof.

For the reasons indicated, we hold that the court erred in sustaining the general demurrer, as well as in rendering judgment for appellees upon the facts developed by the evidence, and it becomes our duty to reverse the judgment and here render same for appellant, which is accordingly done.

Reversed and rendered.

*On Motion for Rehearing.*

KEY, C. J. Appellees have presented to this court a motion for rehearing, which, though containing nothing new, has been given due consideration. But we are still of the opinion that this court has correctly decided the case, and the motion referred to is overruled.

In thus finally disposing of the case the writer deems it proper, with the concurrence of his associates, to add some remarks to our former opinion.

The most important question in the case is the proper construction to be placed on section 2, article 10 of the Constitution of this state, which declares that all railroads in this state are public highways, and that railroad companies are common carriers, and in addition thereto reads:

"The Legislature shall pass laws to regulate railroad freight and passenger tariffs, to correct abuses and to prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this state, and [to] enforce the same by adequate penalties."

[4, 5] That provision of the Constitution is equivalent to a direct prohibition of unjust discrimination by railroads in either freight or passenger tariffs; and, therefore, if carrying one person free while another is required to pay for the same service is an unjust discrimination, then such free transportation is in violation of the Constitution, although the Legislature may have attempted to authorize such discrimination. Some courts and judges may have reached the conclusion and announced the doctrine that when a common carrier does not charge a particular person more than the law permits, the fact that it renders a similar service for other persons without charge does not constitute an unjust discrimination. We controvert the correctness of that doctrine, in so far as it is sought to have it applied in construing the constitutional provision under consideration.

[6] The Constitution was adopted and became a law by a popular vote, and not by action of the Legislature, or any other body, and therefore its provisions are to be construed as they were understood by the average voter when he cast his ballot for or against the adoption of the Constitution. That rule is so well established that it is not necessary to cite authorities in its support, and perhaps it has never been more clearly and tersely expressed than was done by Chief Justice Gaines, in Brady v. Brooks, 99 Tex. 378, 89 S. W. 1052, in these words:

"The voters, as a rule, are unlearned in the law and, as persons of that class would reasonably construe the Constitution upon which they vote, such ought to be the construction of the courts."

Applying that rule to this case, we feel quite sure that if the electors who voted in the adoption of the present Constitution had been asked if they considered it an unjust

discrimination for a railroad to charge one passenger three cents per mile for transportation and carry another passenger free of charge, the great majority of them would have answered the question in the affirmative, unless it was accompanied by a statement showing some special reason why free transportation should be furnished, such as inability to pay, or some like reason. In construing the words "unjust discrimination" as they appear in that section of the Constitution it should be borne in mind that it is declared therein that railroads are public highways. Being public highways and rendering such an important service to the public generally, the corporations which own them are often designated in legal terminology as quasi public corporations. This is a proper designation, because under charters granted by the state they perform functions and render services which might have been performed and rendered by the state. Bearing in mind this and the fact that the section of the Constitution under consideration in its first sentence declares railroads to be public highways, it seems natural and reasonable that the average voter, or person of average intelligence, in reading that section of the Constitution, would understand it to embody a condemnation of every discrimination which can be measured in dollars and cents. Generally speaking, it may be conceded that persons who perform services by contract may charge one person and render similar services free for another person without being guilty of unjust discrimination; but when, instead of acting as a common carrier, as the state might do, it grants a charter to a corporation to perform such important services for the public, the rule ought to be different. In a wide and comprehensive sense every citizen of the state is a constituent thereof. He is a portion of the body politic, and therefore, as between him and the other constituents, the state has no moral right to discriminate by furnishing free to others that for which it compels him to pay, unless such discrimination is justified by some meritorious reason. Such being the moral rights of the citizen as between himself and the state, it would seem that when the latter grants charters to railroad corporations authorizing them to construct railroads for the purpose of serving the people as common carriers, and the people place in their Constitution a declaration that such railroads are public highways and are prohibited from making unjust discriminations, the latter provision should be so construed as to prevent that which in sound morals would have been an unjust discrimination as between the citizen and the state, if the state had not granted such charters and had itself undertaken to perform such services as a common carrier.

When the case was originally submitted counsel for appellees urged the contention, and have repeated the same in the motion under consideration, to the effect that it was not intended by the makers of the Constitution that the courts should be vested with power to revise the action of the Legislature in enacting laws for the enforcement of the constitutional provision under consideration, and that it is for the Legislature alone to determine what will constitute an unjust discrimination in freight and passenger tariffs.

[7] The contention referred to involves the proposition that the framers of the Constitution intended that the three departments of the government—executive, legislative, and judicial—should be entirely separate and independent of each other, to the extent that the courts should not have the power to determine whether or not any act of either other department was in violation of the Constitution and therefore invalid. At an early period in the history of constitutional government in this country, that doctrine was vigorously supported by some of our ablest and most patriotic citizens; but when the Supreme Court of the United States was called upon to consider it in reference to the federal Constitution, its soundness was denied, and the rule established to the effect that, under the federal Constitution, the federal courts have the power, and, under certain circumstances, it is their duty, to determine whether or not official action of either of the other departments is in contravention of the federal Constitution, and, if so, to declare such action invalid; and that such a decision by the Supreme Court of the United States constitutes the paramount law upon the particular subject.

Generally speaking, the federal doctrine upon that subject has been followed and applied by state courts in reference to state Constitutions. That is now the prevailing American doctrine; it has always prevailed in this state, and its application to this case refutes the contention urged by appellees' counsel.

Motion overruled.